Good morning, everyone. Just give me one moment to set up here. Well, we have three matters set for argument today, but they're all related. Judge Fodor, Judge Nelson, and I welcome you to the Ninth Circuit, and we look forward to hearing your arguments. The first case up is U.S. v. Holmes. When you're ready, counsel. Good morning, and may it please the Court. Amy Saharia for Appellant Elizabeth Holmes. I'd like to reserve five minutes for rebuttal. All right. I'll try to help you out, but as you know, keep your eye on the clock as well. I will, Your Honor. The central issue in this case was whether Ms. Holmes knowingly misrepresented the capabilities of Theranos' technology. The government told the jury this was the underlying false statement in the case and a thread through the investor scheme. The government's case on this central issue rested in substantial part on two categories of evidence, Dr. Das' untested, undisclosed scientific analysis and the testimony of Dr. Rosendorf, whose bias and incompetence we could not expose on cross-examination. Both categories of evidence were infected with error. On this record, with a general verdict, the government cannot show the errors were harmless. The case was close. This was the most powerful evidence on the central issue in the case, and Ms. Holmes provided the jury with a plausible alternative narrative of her intent, including through her own testimony. Although I'd like to focus today on the points I just summarized, of course I would be happy to answer questions on any additional arguments the Court wishes to discuss. Can I just ask you to clarify a little bit more? You said the case was close. Yes, Your Honor. I didn't come away reading all of this with the same impression. There was, it seemed to me, pretty overwhelming evidence. Separate and apart from any complaints about Das' testimony or Rosenbaum's testimony, I don't want to start from the back end, but maybe you can explain why this wouldn't have been harmless there. You sort of suggested in your opening that that's because it wasn't a verdict form, but that can't just — the government can still show harmless error even when there's not a specific verdict form. Of course, Your Honor. So let me talk about harmlessness. First of all, with respect to the case being close, the government prevailed on only four of 12 counts. The jury acquitted Ms. Holmes on four counts, and it hung on three additional counts. It deliberated for seven days. Those are all classic indicators. This Court has identified of a case being close. The Court also looks to whether the defense provided the jury with an alternative, plausible narrative. The Court doesn't ask whether the defense case was overwhelming, but was there a plausible defense case? And here there absolutely was a plausible defense case. Ms. Holmes testified. Because she testified, we were able to put into the record contemporaneous documents showing company scientists telling her in real time that the technology worked, telling her in real time that the company's partnerships with pharmaceutical companies had been successes, and showing that the company was so confident in its technology that it submitted it to the FDA. Counsel, may I ask you, you characterized the case as being about whether there was a knowing misrepresentation. When you say, following up on Judge Nelson's question, when you say that this is close, are you saying it's close as to her knowledge, or are you arguing that it was close as to whether there was a misrepresentation? It is close as to her knowledge. There was substantial evidence that we put forward, both cross-examining the government's witnesses, but then especially in the defense case, showing that in real time, she in good faith believed in the accuracy of this technology. So you're not disputing the evidence and findings with respect to the fact that this was not accurate and the information was not good? We're not, Your Honor. Now, we separately have an argument that the reliability of Dr. Das' expert opinion has never been proven, but putting that aside, no, Your Honor. Now, with respect to the other alleged misrepresentations and the fact that this was a general verdict, the government relies heavily on the notion that it proved other alleged misrepresentations, that it claims stand separate and apart from the accuracy of the technology. And I want to make two points about that particular argument. First of all, we don't know which misrepresentation the jury relied on because we have a general verdict. I would point the Court to the Fifth Circuit's decision in United States v. Alexius, which we cite, in that case, which is quite similar to this one. There were four alleged false statements that were part of a perjury conviction. There was an evidentiary error, a confrontation clause violation, that went to one of those four alleged misstatements. And the Fifth Circuit held that because it didn't know which of the misstatements that jury relied on, it was required to reverse. So, for example, you would say that the misrepresentations about their continuing growth in Walgreens and Safeway. Walgreens, Your Honor. Walgreens. That was not, the government can't rely on that because it wasn't specified in the indictment. Is that your argument, Your Honor? It wasn't specified on the verdict form which misrepresentation the jury was relying on. But what's more than that, the government itself tied that misrepresentation and all the misrepresentations back to the accuracy of the technology in the closing argument. Let me give the Court a few examples. Let me have you address knowledge. Yes. Because as you said, if the government hasn't shown knowledge, then that gives you a case to make for reversal in this case. I want you to focus on the evidence of knowledge that the government did present. You've raised quite a number of evidentiary challenges, which, as you know, much of which we review with substantial deference to the district courts, the extent that the district court made findings. With regard to the DAS testimony, I don't see from the briefing that you're really contesting, nor I think could you contest that a good portion of his testimony is admissible as percipient. Now the question is, at what point did it potentially veer into the expert realm? What is your view of that? So his opinion, which is reflected in the patient impact assessment, that the technology was not accurate, that there was a potential impact on patient test results from the technology, that is an opinion that is based on scientific knowledge, and it falls squarely within Rule 701C. There is no on-the-job exception to Rule 702. That is why Rule 701C was added to Rule 701. So his opinion, which is reflected in that patient impact assessment, is clearly an expert opinion. Okay. We can debate that, but there's an independent relevance involved. He was her employee, hired to do a job. He did that job, and in conducting the assessment, the patient impact statements in response to CMS, he told her certain things that tended to show that she was aware of problems in technology and ultimately decided that he really had no choice in his professional capacity to void the test results. All that really goes to knowledge, independent of whether he's testifying as an expert or not. Why can't the government bring that in for that purpose? For two reasons. First of all, that's not the purpose that it admitted that evidence for. It urged the jury in closing to use his opinion for its truth. That's at ER 12578, where it told the jury to use his opinion to prove that technology did not work. Second of all, her state of mind in 2016 was not relevant to any issue before the jury. The investor counts ended in 2015. The patient counts, technically they charge a patient conspiracy going through 2016, but the government made zero attempt to prove any representations to patients in 2016 after Dr. Das communicated. But there's an inference there, so now does it become a 4-3 evaluation by the district court? No, Your Honor. There still is the fundamental 7-0-2 question with respect to Dr. Das's opinion, given that the government admitted it for its truth and asked the jury to use it for its truth. The court needed to conduct a reliability analysis of that opinion before admitting it. I think it's— Can I just add? You said in their closing arguments they made that argument. At what point would the district court need to be put on notice that this was what they were putting in them for? Because if—I mean, to Judge Wynn's point, the government was making a point that this was Holmes' knowledge. If they sort of switched—if they had to say anything in closing statements, would you have had the same objection here? Yes, because at the same time that the government admitted the patient impact assessment and Dr. Das's opinions, it also admitted the CMS report through Dr. Das, and it made quite clear at the time that it was admitting the CMS report that it was not admitting it for its truth and was admitting it only for the limited purpose of knowledge or notice. And at the same time, it did not admit the patient impact assessment for that limited purpose. Now, we still have the point that her state of mind in 2016 was just not relevant to any issue in the case, given the time period of the investor conspiracy and given that there were no representations to patients made after the time of his expert analysis. Am I correct in understanding from your briefing that you're really not challenging his expertise? It's more the Daubert gatekeeping function. Exactly, Your Honor. And I think on that point, it's quite noteworthy that when the government informed us five weeks before trial in an email that it might elicit expert opinions from Dr. Das, it cited us as the bases and reasons for his opinions to the supplemental expert report of its retained expert, Dr. Master. As to Dr. Master, the district court had granted us a Daubert hearing because it could not determine whether his opinions were reliable based on the papers. And even though it granted us that Daubert hearing as to Dr. Master, we never got a Daubert hearing with respect to Dr. Das. There was no assessment of his reliability, of his opinions, no disclosure. We've never received disclosure to this date of his expert. Well, wouldn't much of his testimony have been admissible in any event as a precipient witness as to what he actually did on the job? Some of it would have been, but not his opinion about whether the technology worked. That was classic expert opinion. That little piece. It's little in terms of the amount of time in his examination that it took, and that's because the government didn't have to actually do the normal work it would do with an expert. It didn't go through his methodology. It just asked him for his ultimate opinion. But it is quite powerful evidence in this case. It is the most powerful evidence about whether the technology worked because it was. Wasn't his opinion expressed in terms of what he concluded in the course of his job? Yes, it was. But, again, there's no on-the-job exception to Rule 702. This Court held that in Figueroa-Lopez, and the Rules Committee then added Rule 701C to Rule 701. Now, I do want to discuss Dr. Rosendorf's cross-examination as well. He was the most critical witness with respect to the issue of knowledge because he was at the company when Ms. Holmes was making representations to investors, unlike Dr. Das, who came after the fact. This was the most important cross-examination of the case for the defense. It was the most important direct examination. By our count, his direct examination was 50 percent longer than any other government witness. The government invoked him more than any other witness in opening and closing. He was the only government witness who supposedly relayed concerns to Ms. Holmes at the time that she was making the representations to investors. And the government, yes. Can I ask you a question about this? Because, I mean, you raised some good points here on both Das and Rosenbaum. But when I was looking at Rosenbaum, what I saw was the district court making some pretty careful distinctions on when cross-examination would be allowed and when it wouldn't. I might have come to different conclusions. But, of course, as Judge Wynn sort of alluded to, we're not reviewing that de novo. We're reviewing that for abuse of discretion. How do we look at this? Because you agree this wasn't a case where you weren't allowed cross-examination. Your contention is the scope of the cross-examination, correct? That's correct. Of course we were allowed to cross-examine him. But as to his post-Theranos employment, two of the places of employment were completely barred from any cross-examination. And as to the third, which was his Perkin-Elmer employment, the key issue there is he was working there at the time of his testimony at trial. His laboratory was under federal investigation by CMS. CMS had found his laboratory was posing immediate jeopardy to patient health and had tied that finding directly to him. I'm still struggling with what does that have to do? Maybe he was incompetent, but that doesn't change the fact that he was telling Ms. Holmes certain facts, and that seems to be the evidence here. I mean, is your statement that she discounted what he told her? Your position would be she discounted what he told her because she didn't have confidence in him? No. First of all, much of his testimony was about oral conversations that are not contemporaneously proven by documents. In fact, his testimony about his departure from the company was hotly contested by Ms. Holmes in her own testimony. But, no, our defense as to Dr. Rosendorf was that he was the person responsible for validating these tests in the laboratory, and to the extent the laboratory was using tests that were not reliable or accurate, he was the one who was supposed to figure that out, and his incompetence, his failure to find that out, shielded Ms. Holmes from knowledge that the laboratory tests were not accurate. We argue that in closing, and the government clearly understood that his competence was squarely at issue because it devoted a substantial part of its rebuttal argument to defending Dr. Rosendorf's competence. This is at ER 12850-56. But doesn't that suggest you had the opportunity, I mean, you did have the opportunity to challenge his competence? But not on cross-examination, and the relevant question for the confrontation clause is whether we had that opportunity on cross-examination, and the evidence that at the time of trial, his laboratory was under federal investigation and CMS had found him specifically, personally, to have failed on his job. It was highly relevant, both to his competence, to his bias, and it was critical to allow us to impeach by contradiction the government asking him on direct examination to compare his experience at Theranos to other laboratories. Counsel, before we eat too much further into your rebuttal time, can I have you briefly address the 407 issue? Yes. Because the decision to void the test results is a pretty compelling piece of evidence for the government. Yes, Your Honor. So as to that issue, there are two pieces of evidence that show that the voiding was not legally required or required by CMS. First of all, the CMS inspector told the government that Theranos made the decision to void the test. It wasn't mandated, but they expected a satisfactory response. And in his professional opinion, the only appropriate response was to void the results. So how do we look at that? And I think embedded in our review of this issue is the factual finding by the district court. And so if you can also address the standard review, is it for clear error? Sure. Well, there is no factual finding by the district court as to this issue. The court just said... Well, implicit factual finding in any event. There is an implicit. The court allowed it to come in without making an express finding and, by the way, without making any Rule 403 balancing. That is not on the record anywhere. But as to that issue, I don't think it can be enough that a company is under federal investigation and that it takes certain actions to try to please the regulator. If that were the case, then any time a company took aggressive actions, even if they weren't legally required, Rule 407 would not come into play. But Rule 407 exists precisely to incentivize companies to take aggressive actions, to take remedial actions, without fear that they will be held against the company. There is no evidence in this case that CMS required this, that this was a response to the immediate jeopardy finding. I think as you'll hear in Mr. Bolwani's appeal, the immediate jeopardy finding didn't relate to the Edison, and therefore this was not a response to the immediate jeopardy finding. Unless the court has further questions. Well, I just have one question. Yes. You said that you had a plausible narrative. Yes. Who is the bad guy here, then? Well, there doesn't need to be a bad guy. There were, in fact, many good people working at Theranos, working day in and day out, trying to and believing that they had created novel technology. Ms. Holmes believed that. She said that in her testimony. There are documents contemporaneously proving that, and that is what she was telling investors. Okay. Thank you. Thank you. Thank you. I'll give you some of your rebuttal time back as our questions ate up nearly all your time. Let's hear from the government. Good morning. May it please the court. Kelly Volkar on behalf of the United States. This court should affirm Holmes' conviction and sentence because the district court did not err, let alone plainly err, in permitting Dr. Doss to testify to his percipient contemporaneous recollections of events in 2016 under Rule 701 rather than 702 and did not abuse its discretion in admitting the two trial exhibits, including the patient impact assessment. The district court did not abuse its discretion in limiting, after four days, Holmes' cross-examination of Rosendorf regarding his purported bias and incompetence post-Theranos, particularly given the topics were irrelevant and cumulative. As Judge Nelson indicated earlier, if there were any trial errors, they were harmless given the overwhelming and multifaceted evidence against Holmes. So whatever we conclude on the last issue, we've still got to walk through some of these other issues. And I've got to say, I have some problems with how this happened, and Dr. Doss in particular, where is the line? They do have a pretty good basis for some unfairness here where you put in an expert, then you didn't use the expert, and then you used a lay witness to get in some of that same testimony. There's a pretty good story here for Ms. Holmes. Your Honor, I respectfully disagree, and I think when the court digs into the record, I think it will quickly find that that portrayal that Holmes has set up falls away. The reason I say that is because the government did notice Dr. Stephen Masters as its expert. Dr. Masters was set to testify on a number of topics. In the Daubert order, the judge allowed some of those topics without a Daubert hearing, and it said that there needed to be a further hearing on certain topics. And I want to talk about what those are for a moment. Dr. Masters was going to be allowed to testify under the district court's order about whether or not Theranos was up to industry standards when it came to accuracy and reliability. Dr. Masters was going to be able to testify about the assay vitamin D. However, Dr. Masters identified in his report that he would like additional information on some of the other blood tests, and that is what the district court said. He needed a Daubert hearing in order to hear more about what the expert was going to base that opinion on. The government provided that additional information and issued a supplemental report in advance of the Daubert hearing as the district judge permitted and was going to have a Daubert hearing on June 30th. It was the defense that asked to move that hearing. The government was prepared to proceed. Okay. I'm not sure. I want to track this. But at the end of the day, did you call Dr. Masters or not? No, Your Honor. That's sort of my question. You had an expert who'd gone through this process, and then you chose not to call that expert. I don't know all the details why. And then you use a late witness that hasn't gone through this. Yes, Your Honor. Thank you. And I think that brings me to the next major point, which is that Dr. Doss did not testify on any of the topics that Dr. Master was noticed for, and that I think is an important distinction between the two as well. Dr. Doss, when we did call him to testify, we noticed him by the June 3rd, 2021, deadline to disclose witnesses as a percipient witness. We learned through briefing actually related to Dr. Master that the defense might have thought of Dr. Doss as an expert. Out of an abundance of caution, we disclosed him, but the government never intended to call Dr. Doss as an expert, and the government never intended to have Dr. Doss fill the shoes of Dr. Master. The government called Dr. Doss to testify about what he observed in real time in 2016, and most importantly, what he told Holmes. And by the panel's questions with my colleague across the aisle a moment ago, I think it's clear that knowledge was the central issue in this case, and Dr. Doss told Holmes directly. He reported directly to Holmes. She hired him, and in fact, at trial, she held him up essentially as her— So that would—I would be willing to buy into that argument wholeheartedly, but for some of the positions that the government took, which was that Doss was also important for the reliability of the tests. So why doesn't that get into some— I mean, it can't just be that anyone can testify to anything they did on the job if it's scientific-related, and they don't have to at some point be admitted as an expert in that area. That's correct, Your Honor, and the district court here exercised its discretion to carefully parse through what was and was not going to be expert testimony, sustained several 702 objections by the defense during trial, during Dr. Doss's testimony. However, the focus at the time at trial was really about the CMS report. Dr. Doss was hired to analyze the CMS report, determine whether or not how the company was going to respond to it, and the entire time he was sharing his findings with Holmes in that— Right. And I think that that's part of the issue that I tried to go through with counsel. There's potentially a dual purpose here. You do have this relevancy of what he told her, and obviously the district court let that in for purposes of allowing the jury to infer knowledge. But you also let in testimony or elicited testimony that's based on his expertise, right? Because it's outside the knowledge of a common layperson, how the — his conclusions about the patient impact statements required highly specialized knowledge. And I think under the government's view, it's almost like if you can get them in as a percipient witness, then you can get in all the conclusions that's based on expert testimony as well. And I don't think that's how 702 works. Your Honor, I respectfully disagree. And the reason being that the patient impact assessment here, it's important to know what that document was. That document was Theranos' response to CMS to detail whether or not it agreed with the findings of CMS and how it was going to correct those deficiencies. And so the reason I completely agree with Your Honor that there has to be a demarcation between Rule 701 and 702, it's just the government's position that the district court adequately employed that distinction here. Every time that the government started to question Doss about whether or not he did his own independent analysis and he came to certain conclusions, that was when the district court sustained Rule 702 objections and did not allow Doss to — Right. So your argument implicitly acknowledges that the government attempted to intrude into areas that would require expert testimony. The burden was really very much on the defense. It's like, well, the government can lay the foundation. The defense has to specifically object to each Q&A. And the court sometimes sustained the objections and sometimes overruled the objection. I mean, the whole Daubert gatekeeping hearing is supposed to prevent all of that. Your Honor, I think taking a step back, the government does believe that Doss was a percipient witness, and to the extent it sounds in this — Well, there's no question that he was. I mean, even Holmes acknowledges that he was. But he was both. And that's what we're grappling with here, is what do we do with one person's testimony when it sways between precipient testimony and expert testimony? And, Your Honor, that's where I would say it is the district court's job in the first instance to be that gatekeeper, to impose that rule, and this was a district court that took that very seriously, that carefully parsed the testimony, listened to both sides. The government did adopt its direct examination in response to the district court's pretrial orders, saying what would cross the line into expert testimony. And, again, going back to the patient impact assessment, because my understanding is that's what my colleague most takes issue with, the patient impact assessment was a document that, while Doss led the charge, it was a company document prepared and sent back to CMS that Holmes ultimately reviewed and approved and even argued with Doss in real time about how to characterize it. And now I get to the statement, my colleague mentioned it a moment ago, that I believe they most take the issue with, which is that the device was unsuitable for patient use. First of all, they did not object in the moment, so that should be reviewed for plain error. And second of all — But can I push back on that slightly? Because, I mean, is that really accurate? It is accurate that they didn't object in the moment, but can it really be said that they hadn't objected to this and that this issue wasn't front and center and that the district court hadn't already ruled on this issue? Your Honor, I would argue that it was not front and center because the district court was ruling — was essentially calling balls and strikes as the testimony was coming in before it. This was a heavily litigated trial. There were also motions to strike that were filed after testimony occurred, but never on this topic. There were post-trial briefings that were filed, but never on this topic. This was a case where every issue was often litigated to death, and the district court took great care in making rulings and sometimes addressing that in the moment. And so I think with that view, knowing the context of this trial, this Court should look with particular skepticism when the defense never chose — Allowed it in without objection in the moment. Not only in the moment, Your Honor, but never challenged it afterwards until before this Court. Was the district court asked to have a Daubert hearing as to any aspect of Doss' testimony? No, Your Honor. The parties beforehand agreed that if Doss was going to come in as an expert, then there would be a Daubert hearing at the same time as Dr. Master. The government chose not to present him as an expert and tried to stay within the  I see. So the district court's rulings were in light of that background. That's correct, Your Honor. And one thing that I was — Counsel, I'm sorry for interrupting you. Knowledge was heavily contested. Perhaps it would be helpful if you can just take a brief moment to kind of sum up the government's evidence of knowledge. Thank you, Your Honor. I was about to pivot to one aspect of this case that I think is incredibly important, because even today defense counsel claims that it was hotly contested whether or not the device worked. And today she said whether or not Holmes knew it worked. It was not really contested that the device did not work. It was undisputed at trial that the Minilab or 4.0, the device that you all saw on page 6 of the opening brief, was never used for patient testing. A witness that the defense called — Well, we're on appeal now, so every inference goes in the government's favor. So it's more helpful, at least for me, if you talk about knowledge rather than whether the device worked or not, because those inferences, now you're going to get the benefit of that in terms of the efficacy of the devices. Thank you, Your Honor. And my apologies. The device, the Minilab or the 4.0, was never used. And Holmes admitted that on cross, that she knew that. It was undisputed that the Edison or the 3.0 or 3.5 was the only device ever used to test Theranos patients, that it was only ever used to test 12 types of blood tests. And Holmes admitted that she knew that on cross-examination. In fact, Holmes admitted on cross-examination that the CMS report validated and vindicated issues that Erica Chung and Tyler Schultz raised in the real time in 2014. It is undisputed that Theranos voided every test ever run on the Edison. And even at that moment in time in 2016, when all of the scientists in the company were telling Holmes that it was a device issue or Doss was telling Holmes that it was a device issue, Holmes pushed back and said that it was actually just lab mismanagement. It was undisputed that the investors did not know that Theranos was using third-party devices to test patients at all, but Holmes knew that. In contemporaneous emails and documents, Holmes suggested to the scientists that they should switch to traditional methods when the Edison was failing. And so, Your Honor, if I may, I think on the harmless point but also to knowledge, Holmes admitted a lot of facts that are known now during her cross-examination, during her testimony, and really what remains in dispute is that she argued, as she did to the jury, that she didn't know at the moment what was going on in the lab. Balwani ran the lab, and she had no idea, and so she hired Doss to turn over rocks. And that's part of the government's harmlessness argument there as well. The defense calls Doss, in their closing argument, essentially a defense witness because Holmes hired him to come in and fix everything. Turning briefly to Rule 407, if I may, Your Honor, first of all, while the district court did not, in the moment at trial, walk through all of his factual findings, the district court implicitly found, as Judge Nguyen noted, that the voiding was legally required, and the district court had the opportunity to spell that out a few months later in responding to Balwani's motions in limine before his trial. And in the Balwani record, 1 S.E.R. 160, Judge Davila walks through exactly what this court has heard, which is that CMS required something to be done. Theranos had to respond to that. In Doss's professional opinion, Doss believed that it had to be voiding. So can I ask about that? Where is the limit on that? Because they did say something had to be done. As I understand it, that conversation happened a couple of times, right? They tried to take, Theranos tried to take some corrective action. They were told that's not enough, so they had to kind of keep re-upping the ante. Do I have that correct, or am I misremembering that? I do know that there was back and forth between the company and CMS, and a lot of that was precluded from coming in at trial in the motion in limine stage. But ultimately, Theranos did void all of the tests. Well, and that's what I'm wondering is at what point, because the question here is whether it was voluntary or involuntary. And it seems like, and I think the district court recognized that there were good arguments on both sides. So how do we judge that? Because it seems like it's a position that was taken in response to the regulatory action, but it might not have been the only mandatory action. So in that sense, it might have been voluntary. How do we look at that? I guess we're still looking under abuse of discretion.  It's under abuse of discretion, so it's a question of whether the district court acted in a logical and plausible manner or a manner unsupported by the record. However, even further than that, I do think this court can look to the purpose of Rule 407, which is to encourage companies before there is government or regulatory intervention to attempt to take remedial measures. Well, but why wouldn't that help Holmes here? Because, I mean, say they were taking more action than they needed to, why wouldn't we want to incentivize that? If we affirm the district court, aren't we sort of disincentivizing that action, that a company is going to take the most restrictive response that they can? And here they may have taken a broader response. Your Honor, I do not think that they took a broader response, and Doss really provided the background for that. Doss said that they were unable to identify the extent, the nature and magnitude, of patients that were harmed. They were unable to comply with the regulatory language that they had to send a corrected report to every patient who received an inaccurate test. Because they were not able to identify every patient who fell into that category, that is why Theranos voided all of the tests, run on the Edison. Right, but the potential implication of the government's position, you know, companies are under investigation all the time, and they're going to do everything they can in order to head off a potential indictment. So lesser measures, okay, the government isn't satisfied, then they escalate the response, escalate the response. So does the natural limit of the government's position mean that every time a company escalate the response in order to satisfy the regulatory agency, then that there's a risk that that may be used as an admission against the company should they be indicted or an individual that's running the company? Your Honor, I think that simply in a situation such as this, and of course, there are no circuit case law that apply Rule 407 in the criminal context. So we are a little bit in a void here and can only look to the air crash Bali case. When there is this regulatory field within which the company is responding, I think that it undercuts the purposes of Rule 407, and I do think that that should be. Well, I think the purpose, as Judge Nelson points out, may cut both ways, right? There's a surprising lack of case law specific to this particular rule. But, I mean, I don't know the answer in this particular case may come down to the deference, but there are some troubling implications based on the government's position. So I wanted to give you a chance to draw some limiting principles or help us think about some limiting principles if you can. And maybe it comes down to a case-by-case analysis. And is each district court's factual findings? I don't know. Absolutely, Your Honor. And I would say, again, that it is abuse of discretion here, and the district court acted within it in carefully waiting to hear Doss's proffer that in his view, but also in the company's view, at the time voiding the test was not debated. Only the characterization of how, of how, sorry, only how to characterize the voiding, whether it was a device issue or a quality control issue, that was the only internal debate. On cross-examination, Holmes elicited that lawyers, herself, clinical consultants, other doctors at the company, and Dr. Doss all agreed that voiding was required. Can I ask one question, and we may take you over, but the statement was made in opposing counsel's argument that this was a closed case. And they make a decent point that there were acquittals on three charges, hung juries on other charges. She was convicted on, was it, three or four charges. What do we do with that as far as throwing this in? Do we look at, well, the evidence was, there was a lot of evidence to support the three charges of conviction, or do we discount that because, is there a way to distinguish between those convictions that, or excuse me, those counts where she was convicted and acquitted? Yes, Your Honor. Of course, we cannot speculate as to why the jury reached the verdict that it did, but it is a big part of the government's harmlessness argument. Ultimately, Doss, the CMS report, the voiding of the test results, that went to the accuracy and reliability of the device, which was the paramount misrepresentation when it came to the patient counts of which Holmes was acquitted. And so whether or not the jury believed her argument that, you know, she didn't know in real time, or that, and hiring Doss to come in to fix it, whether or not they bought those arguments, we don't know. But we do know that the jury acquitted and that the evidence that she's challenging on appeal largely went to the patient counts. We also know that there was a plethora of other evidence on the accuracy and reliability of the device. There was Dr. Rosendorf, Erica Chung, Sharika Ganga-Kedkar. There were multiple other witnesses who testified on that topic. But even more importantly, the counts she was convicted on, which was four counts, the conspiracy to defraud investors, and three investors who invested in 2014, there were multiple misrepresentations that were made to those investors, including about the financial health of the company, work with the military, the expanding relationship with Walgreens, the doctored pharmaceutical reports, which Holmes admitted in her cross-examination she altered before sending to Walgreens, and the fact that Theranos was using third-party devices to test patients. Holmes told PFM, one of the counts of conviction, that the Minilab, the device on page 6 of the opening brief, was being used to test patients when she knew that it wasn't. And so with that, I will just, I see I'm over time, so unless the court has questions about Rosendorf, the government is ready to submit. Thank you, Counsel. Thank you, Your Honor. Can you put four minutes on the clock? Thank you. I want to respond briefly on harmlessness to the points that Counsel just made and then touch on a few points on DOS. As to harmlessness and as to the government's argument about the patient counts also turning on accuracy and reliability, we don't know why the jury acquitted on those counts, but I submit one reason is because the government failed to actually put into evidence any content of any advertisements to patients, any brochures to patients. There was virtually no evidence about the content of representations to patients. Given that, I think it would be completely improper to speculate as to why the jury acquitted on those counts. As to Ms. Holmes' knowledge, the government primarily relied on evidence from 2016. She cited the voiding. She cited what Ms. Holmes did in 2016. But the relevant question is what did she know at the time of the representations to investors in 2013 and 2014? And on that, the key issue was Dr. Rosendorf. Counsel mentioned Ms. Chung, but Ms. Chung admitted she never spoke to Ms. Holmes about any concerns about the technology. For the reasons we explain in our reply brief at pages 30 and 31, the government itself repeatedly tied all of the alleged misrepresentations back to the accuracy of the technology to Ms. Holmes' knowledge of the accuracy of the technology. Just to give one example, at ER 12544, the government told the jury in closing that the financial projections were misleading because they rested on a false assumption about the number of Walgreens stores that would open, and the reason Ms. Holmes knew that assumption was false and misleading was because she knew the technology did not work. The government itself tied everything back to the accuracy of the technology. As to Dr. Doss, let me just respond to a few points the government made. First, Dr. Doss absolutely testified to the same opinion that Dr. Master had in his expert report. Dr. Master purported to opine that, excuse me, theranosis technology was not capable of producing accurate and reliable test results for certain tests. That is the same opinion that Dr. Doss gave at trial. As to Your Honor's question about whether there was a request for a Daubert hearing, absolutely. We moved to strike Dr. Doss' opinions before trial, and when we moved to strike the opinions, we said that if he were allowed to provide expert opinions, there had to be a Daubert hearing. And the court said, yes, if I allow him to provide expert opinions, there is going to be a Daubert hearing. And then we objected at trial on Rule 702 grounds, but the court overruled that Rule 702 objection. Counsel suggests that there were rulings during the course of his testimony, objections based on 702 that were sustained. There were a few objections that were sustained that went to the issue of his agreement with the CMS findings on that particular question, where the government said, did you agree with the CMS finding? The court did overrule, excuse me, did sustain an objection. But the key issue on the waiver point is that when he, when the government sought to admit the patient impact assessment, the court overruled our Rule 702 objection, and then the government proceeded to ask him about the conclusions that he drew from that assessment, including the one at the end of that segment of his examination that the government points to. Now, the government made the argument that the patient impact assessment is a company document, and therefore somehow it's not subject to Rule 702, but the government never laid a foundation to admit that report as a business record. It did not lay that foundation with Dr. Das. It's unclear how that could be a business record, because it was not the regular practice of the company to produce that kind of document. Unless the court has further questions, we urge the court to reverse and remand for a new trial. Thank you very much, counsel, to both sides for your very helpful arguments today. The matter is submitted.
judges: SCHROEDER, NGUYEN, NELSON